ACCEPTED
04-14-00473-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
7/1/2015 12:24:21 PM
KEITH HOTTLE
CLERK

## NO. 04-14-00473-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
07/1/2015 12:24:21 PM
KEITH E. HOTTLE
Clerk

## IN THE
## FOURTH COURT OF APPEALS
## AT SAN ANTONIO, TEXAS

**ARC PARKLANE, INC., D/B/A PARKLANE WEST HEALTHCARE CENTER,**
Appellant

v.

**BELEN BETTS, INDIVIDUALLY, AND AS EXECUTRIX OF THE ESTATE OF DELBERT BETTS, DECEASED, AND SHIRLE BETTS AND DANA GIBSON, INDIVIDUALLY,**
Appellees

## MOTION TO LIFT ABATEMENT AND REINSTATE INTERLOCUTORY APPEAL

R. Barry Brin
State Bar No. 00792371
bbrin@brinandbrin.com
Lorien Whyte
State Bar No. 24042440
lwhyte@brinandbrin.com
Brin & Brin, P.C.
6223 IH 10 West
San Antonio, Texas 78201
(210) 341-9711 telephone
(210) 341-1854 facsimile

**ATTORNEYS FOR APPELLANT ARC PARKLANE, INC., D/B/A PARKLANE WEST HEALTHCARE CENTER**

1

**TO THE HONORABLE FOURTH COURT OF APPEALS:**

Appellant Arc Parklane, Inc. D/B/A Parklane West Healthcare Center files this Motion to Lift Abatement and Reinstate Interlocutory Appeal and respectfully shows the following:

## INTRODUCTION

On August 5, 2015, this Court abated Cause Numbers 04-14-00472-CV and 04-14-00473-CV pending the outcome of three proceedings before the Texas Supreme Court. APPX 1 (*Williamsburg Care Co. L.P. v. Acosta*, No. 13-0576, 2015 WL 1029779 (Tex. Mar. 6, 2015) (per curiam); *Fredericksburg Care Co. L.P. v. Lira*, No. 13-0577, 2015 WL 1026224 (Tex. Mar. 6, 2015) (per curiam); *Fredericksburg Care Co. L.P. v. Perez*, 13-0573, 2015 WL 1035343 (Tex. Mar. 6, 2015). Both Cause Number 04-14-00472-CV and 04-14-00473-CV are interlocutory appeals in which Appellant has sought review of the trial court's orders denying Appellant's motions to compel arbitration.

On March 6, 2015, the Texas Supreme Court reversed this Court's judgments in *Acosta*, *Lira*, and *Perez*. *Id.* Then, on June 26, 2015, the Supreme Court denied Appellee's Motion for Rehearing and issued the mandate. APPX. 2; APPX. 3. As a result, the Supreme Court proceedings are now final.

1

## ARGUMENT

The abatement of this interlocutory appeal was granted by this Court because one of the issues to be addressed was on review by the Supreme Court in *Acosta*, *Lira*, and *Perez*. *Perez*, 2015 WL 1035343. The issue before the Court was whether the Federal Arbitration Act is reverse preempted by the McCarran Ferguson Act ("MFA") because section 74.451 is a state law enacted for the purpose of "regulating the business of insurance." *Id.* The Supreme Court concluded that section 74.451 not such a state law and is therefore not exempted by the MFA from FAA preemption. *Id.* Accordingly, the Court reversed this Court's judgment in *Acosta, Lira,* and *Perez* and held the trial court erred in denying the motions to compel arbitration. *Id.*

Due to the Supreme Court's ruling, one of the grounds propounded by Appellee in opposition to Appellant's motion to compel arbitration in the underlying proceeding has now been determined to be improper. However, there are additional issues regarding the trial court's denial of the motions to compel arbitration that need to be addressed in this appeal. Accordingly, Appellant asks this Court to lift the abatement and reinstate the interlocutory appeal to address Appellant's remaining issues. Additionally, Appellant requests this Court set a new briefing deadline since the records have been filed but to date no briefs have been filed.

2

**PRAYER**

Accordingly, Arc Parklane, Inc. D/B/A Parklane West Healthcare Center asks this Court to lift the abatement, reinstate the interlocutory appeal on the Court's docket, and set a briefing deadline for Appellant to file its initial brief in Cause Number 04-14-00473-CV.

Respectfully submitted,

R. Barry Brin
State Bar No. 00792371
bbrin@brinandbrin.com
Lorien Whyte
State Bar No. 24042440
lwhyte@brinandbrin.com
Brin & Brin, P.C.
6223 IH 10 West
San Antonio, Texas 78201
(210) 341-9711 telephone
(210) 341-1854 facsimile


BY:  /s/ Lorien Whyte
　　　Lorien Whyte


**CERTIFICATE OF CONFERENCE**

I certify that I have conferred with Gavin McInnis and he responded that he is unopposed to this *Motion to Lift Abatement and Reinstate Interlocutory Appeal.*


/s/ Lorien Whyte

3

# CERTIFICATE OF SERVICE

This is to certify that on the <u>1st</u> day of July 2015 a copy of the *Motion to Lift Abatement and Reinstate Interlocutory Appeal* was served pursuant to the Texas Rule of Appellate Procedure 9.5 upon the following counsel:


Marynell Maloney
Gavin McInnis
Marynell Maloney Law Firm,
P.L.L.C.
115 East Travis Street, Suite 1800
San Antonio, Texas 78205
(210) 212-8000 Phone
(210) 212-8385 Fax


<u>/s/ Lorien Whyte</u>

# APPENDIX

## TABLE OF CONTENTS

| Appendix No. | Description |
|---|---|
| 1. | Supreme Court Opinions in *Acosta, Lira* and *Perez* |
| 2. | Supreme Court Orders Denying Rehearing in *Acosta, Lira* and *Perez* |
| 3. | Supreme Court Mandates in *Acosta, Lira* and *Perez* |

# TAB 1

# IN THE SUPREME COURT OF TEXAS

No. 13-0576

THE WILLIAMSBURG CARE COMPANY, L.P., PETITIONER,

v.

JESUSA ACOSTA, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

PER CURIAM

The outcome of this case is controlled by our opinion in *Fredericksburg Care Co. v. Perez*, __ S.W.3d. __ (Tex. 2015). Both cases, along with a third case styled *Fredericksburg Care Co. v. Lira*, __ S.W.3d. __ (Tex. 2015) (per curiam), involve the question of whether a federal law, the McCarran-Ferguson Act (MFA), 15 U.S.C. §§ 1011–1015, exempts Texas Civil Practice and Remedies Code section 74.451 from being preempted by the Federal Arbitration Act, 9 U.S.C. §§ 1–16. The court of appeals consolidated this case with *Perez* and *Lira* for oral argument, and issued identical opinions (except for changing the identities of the parties) holding that the MFA exemption from preemption applied to section 74.451. 406 S.W.3d 711, 723 (Tex. App.—San Antonio 2013). We hold today in *Perez* that section 74.451 was not a law enacted for the purpose of regulating the business of insurance and thus does not qualify for the MFA exemption from

preemption. *Perez*, __ S.W.3d at __. The trial court should have granted the motion to compel arbitration. *Id.*

Accordingly, we grant the petition for review in this case, and without hearing oral argument, TEX. R. APP. P. 59.1, we reverse the court of appeals' judgment and remand this case to the trial court to proceed in a manner consistent with our opinion in *Perez*, __ S.W.3d __.

OPINION DELIVERED: March 6, 2015

2

# IN THE SUPREME COURT OF TEXAS

No. 13-0577

THE FREDERICKSBURG CARE COMPANY, L.P., PETITIONER,

v.

BRENDA LIRA, AS REPRESENTATIVE OF THE ESTATE OF
GUADALUPE QUESADA, DECEASED, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

**PER CURIAM**

The outcome of this case is controlled by our opinion in *Fredericksburg Care Co. v. Perez*,

__ S.W.3d. __ (Tex. 2015). Both cases, along with a third case styled *Williamsburg Care Co. v.*

*Acosta*, __ S.W.3d. __ (Tex. 2015) (per curiam), involve the question of whether a federal law, the

McCarran-Ferguson Act (MFA), 15 U.S.C. §§ 1011–1015, exempts Texas Civil Practice and

Remedies Code section 74.451 from being preempted by the Federal Arbitration Act, 9 U.S.C.

§§ 1–16. The court of appeals consolidated this case with *Perez* and *Acosta* for oral argument, and

issued identical opinions (except for changing the identities of the parties) holding that the MFA

exemption from preemption applied to section 74.451. 407 S.W.3d 810, 822 (Tex. App.—San

Antonio 2013). We hold today in *Perez* that section 74.451 was not a law enacted for the purpose

of regulating the business of insurance and thus does not qualify for the MFA exemption from

preemption. *Perez*, __ S.W.3d at __. The trial court should have granted the motion to compel arbitration. *Id.*

Accordingly, we grant the petition for review in this case, and without hearing oral argument, TEX. R. APP. P. 59.1, we reverse the court of appeals' judgment and remand this case to the trial court to proceed in a manner consistent with our opinion in *Perez*, __ S.W.3d __.

OPINION DELIVERED: March 6, 2015

2

# IN THE SUPREME COURT OF TEXAS

No. 13-0573

THE FREDERICKSBURG CARE COMPANY, L.P., PETITIONER,

v.

JUANITA PEREZ, VIRGINIA GARCIA, PAUL ZAPATA, AND SYLVIA SANCHEZ,
INDIVIDUALLY AND AS ALL HEIRS OF ELISA ZAPATA, DECEASED, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

**Argued October 14, 2014**

JUSTICE GREEN delivered the opinion of the Court.

This case involves a federal statutory exception to the general rule that federal law preempts state law. One of the federal laws at issue, the McCarran-Ferguson Act (MFA), 15 U.S.C. §§ 1011–1015, provides an exemption from preemption that applies to state statutes enacted for the purpose of regulating the business of insurance. The trial court found that the MFA applied, triggering the exemption under which the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, would not preempt section 74.451 of the Texas Civil Practice and Remedies Code, relating to agreements to arbitrate health care liability claims. The trial court denied the defendant's motion to compel arbitration because the arbitration clause did not comply with section 74.451 and was therefore invalid. The defendant filed an interlocutory appeal, and the court of appeals affirmed. 406 S.W.3d

313, 315 (Tex. App.—San Antonio 2013). We hold that the MFA does not apply to section 74.451 and reverse the court of appeals' judgment.

## I. Factual and Procedural Background

The Fredericksburg Care Company, L.P. (Fredericksburg), operates a health care facility—commonly known as a nursing home—that specializes in providing long-term care to patients. Elisa Zapata was a patient and resident under the care and supervision of Fredericksburg at the time of her death. Zapata's death and survival beneficiaries (the Beneficiaries) sued Fredericksburg for negligent care and wrongful death. Fredericksburg moved to compel arbitration based on an arbitration clause contained in an agreement that Zapata signed prior to her admission into the nursing home.

It is undisputed that the pre-admission agreement's arbitration clause did not comply with section 74.451's requirement that an agreement to arbitrate a health care liability claim must contain a written notice in bold-type, ten-point font that conspicuously warns the patient of several important rights. *See* TEX. CIV. PRAC. & REM. CODE § 74.451(a). Nonetheless, Fredericksburg's motion to compel arbitration asserted that federal law should determine the enforceability of the arbitration clause because the underlying patient–provider transaction involved interstate commerce, which made the FAA applicable to the pre-admission agreement. In Fredericksburg's view, the FAA preempted section 74.451 because the two laws directly conflicted, and the FAA therefore prevented the arbitration clause from being invalidated.

The Beneficiaries did not dispute Fredericksburg's position that the FAA would normally preempt section 74.451. Rather, they argued that section 74.451 was part of a state law enacted for

2

the purpose of regulating the business of insurance and fell within the protection of the MFA. The MFA trumped preemption under the FAA, the Beneficiaries argued, because Congress created an exemption from preemption for any federal law that could be "construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." *See* 15 U.S.C. § 1012(b). The trial court denied Fredericksburg's motion to compel arbitration, and Fredericksburg filed an interlocutory appeal.

The court of appeals affirmed the trial court's ruling. 406 S.W.3d at 315. The court of appeals noted that section 74.451 is part of the Texas Medical Liability Act (TMLA), and that Chapter 74 succeeded the Texas Medical Liability Insurance Improvement Act (TMLIIA). *Id.* at 320. After examining the reasoning of courts interpreting the earlier, substantially identical TMLIIA provision, the court of appeals concluded that "section 74.451 is part of a law enacted for the purpose of protecting and managing the performance of insurance policies in the area of medical malpractice and health care liability," and therefore fell within the MFA's protection. *Id.* at 324. In making this determination, the court of appeals looked to the legislative purpose behind Chapter 74 as a whole in deciding that it, much like its TMLIIA predecessor, was enacted to regulate the business of insurance in Texas. *Id.* at 324–25. The court of appeals held that the MFA applied to exempt section 74.451 from FAA preemption, and the trial court properly denied Fredericksburg's motion to compel arbitration because the arbitration clause was unenforceable under section 74.451. *Id.* at 325–26. We granted Fredericksburg's petition for review. 57 TEX. SUP. CT. J. 305, 307 (Mar. 21, 2014).

## II. FAA Preemption

The parties do not dispute that the FAA, when applicable, preempts section 74.451 except when an exemption applies. The trial court and court of appeals both assumed without deciding that the FAA applied in this case, allowing them to reach the MFA question. *See id.* at 322. This approach is consistent with the approach other courts of appeals have taken. *See In re Sthran,* 327 S.W.3d 839, 845–46 (Tex. App.—Dallas 2010, orig. proceeding); *In re Kepka,* 178 S.W.3d 279, 288 n.9 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding), *disapproved of on other grounds by In re Labatt Food Serv., L.P.,* 279 S.W.3d 640 (Tex. 2009) (orig. proceeding). We note, however, that if the FAA does not apply, then section 74.451 is not preempted and it is unnecessary to address whether the MFA provides an exemption from FAA preemption.

The FAA applies to arbitration clauses in contracts that affect interstate commerce. *In re L & L Kempwood Assocs., L.P.,* 9 S.W.3d 125, 127 (Tex. 1999) (orig. proceeding) (per curiam) (recognizing that the FAA "extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach") (citing *Allied-Bruce Terminix Cos.v. Dobson,* 513 U.S. 265, 273–77 (1995)). We have previously concluded that evidence of Medicare payments made to a health care provider on a patient's behalf was "sufficient to establish interstate commerce and the FAA's application" to the case. *In re Nexion Health at Humble, Inc.,* 173 S.W.3d 67, 69 (Tex. 2005) (orig. proceeding) (per curiam). The record in this case reflects that Fredericksburg received Medicare payments on behalf of the deceased patient, Zapata, and the parties have never challenged the applicability of the FAA in this case. *See id.* We therefore assume, as did the trial court and court of appeals, that the FAA applies here.

4

In 2005, this Court held that the FAA preempted a Texas Arbitration Act (TAA) requirement that an attorney sign a client's agreement to arbitrate a personal injury claim. *Id.* This was because the TAA required an additional element—the attorney's signature—that the FAA did not, and the laws were in direct conflict. *Id.* Applying that precedent here, section 74.451's requirement that an arbitration clause provide a bold and conspicuous warning of a patient's right to consult an attorney and the requirement that an attorney must sign the agreement are additional requirements that directly conflict with the FAA, which contains no such requirements. *See id.*; *see also Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 683 (1996) (finding that the FAA preempted a nearly identical statute that required a specific notice to appear on the first page of an agreement containing an arbitration clause). *Compare* 9 U.S.C. § 2, *with* TEX. CIV. PRAC. & REM. CODE § 74.451(a). Thus, the FAA preempts section 74.451 and the parties will be compelled to arbitrate—despite the arbitration clause's deficiencies under section 74.451—unless the MFA exempts the Texas law from FAA preemption.

### III. MFA Applicability

The MFA provides that the regulation and taxation of the business of insurance is a matter of state law. *See* 15 U.S.C. § 1012(a). The MFA provision at issue here, section 1012(b), states in full:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State *for the purpose of regulating the business of insurance*, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as

5

the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

*Id.* § 1012(b) (first emphasis added) (citation omitted). This case requires us to interpret and apply federal preemption law, and therefore United States Supreme Court precedent controls the outcome. *See Eichelberger v. Eichelberger*, 582 S.W.2d 395, 401 (Tex. 1979). In analyzing the MFA, the Supreme Court observed that section 1012(b) is divided into two clauses. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 504 (1993). The second clause deals with antitrust matters, *see id.*, and is not at issue here. This case concerns the MFA's first clause, which applies to laws "enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). Courts have analyzed the MFA's first clause under a three-part test that determines whether: "(1) the federal statute does not specifically relate to the 'business of insurance,' (2) the state law was enacted for the 'purpose of regulating the business of insurance,' and (3) the federal statute operates to 'invalidate, impair, or supersede' the state law." *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998); *see also Davister Corp. v. United Republic Life Ins. Co.*, 152 F.3d 1277, 1279 n.1 (10th Cir. 1998). The MFA applies here if each part of the test is satisfied. *See Davister Corp.*, 152 F.3d at 1280 n.2 ("[The] three-part test must be satisfied before the [MFA] can apply.").

Regarding the first part of the test, every court that has considered the FAA in this context has concluded that the FAA does not specifically relate to the business of insurance. *See, e.g., Munich Am. Reinsurance Co.*, 141 F.3d at 590; *Am. Bankers Ins. Co. of Fla. v. Crawford*, 757 So. 2d 1125, 1131 (Ala. 1999). We agree that "[t]here is no question that the FAA does not relate specifically to the business of insurance," *Munich Am. Reinsurance Co.*, 141 F.3d at 590, and

6

therefore part one of the test is satisfied. Moreover, the third part of the test is satisfied by our conclusion that the FAA directly conflicts with, and preempts, section 74.451 absent an exemption, and therefore operates to "invalidate, impair, or supersede" our state law. *See* 15 U.S.C. § 1012(b). Thus, only the second part of the test remains, and we must decide whether the state law in question was "enacted by [the State of Texas] for the purpose of regulating the business of insurance." *See id.*

We first consider exactly which state law is in question. Both parties' main arguments focus on whether courts performing an MFA analysis should look at the specific statutory provision in dispute (section 74.451) or the state law in its entirety (Chapter 74). The parties highlight instances where courts have employed each approach. The court of appeals analyzed Chapter 74 as a whole in finding the MFA applicable. 406 S.W.3d at 325.

Fredericksburg contends that *Fabe* requires us to analyze section 74.451—a law that regulates the contents of an agreement to arbitrate a health care liability claim between a patient and a health care provider[1]—in isolation from the statutory scheme that surrounds it. Because we cannot look any further, according to Fredericksburg, section 74.451 cannot be viewed as a law enacted for the purpose of regulating the business of insurance to warrant MFA protection. *See Garcia v. Island Program Designer, Inc.*, 4 F.3d 57, 61–62 (1st Cir. 1993) (citing *Fabe*, 508 U.S. at 508–10) (analyzing a single provision in an insurance company liquidation and insolvency statute instead of

---

[1] More accurately, section 74.451 is directed at agreements between a physician, professional association of physicians, or other health care provider and a patient or potential patient. TEX. CIV. PRAC. & REM. CODE § 74.451(a). For ease of reference, we refer to section 74.451 as applying to an agreement between a health care provider and a patient.

7

examining the statute as a whole), *abrogated on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996); *see also Allen v. Pacheco*, 71 P.3d 375, 383 (Colo. 2003) (analyzing a specific statute and finding it "irrelevant" that other sections of the greater statutory scheme "address medical malpractice issues not involving the relationship between an insurer and insured").

*Fabe*'s guidance for how to evaluate a statute under the MFA is not as clear as Fredericksburg suggests, however. As recognized by the United States Court of Appeals for the Fifth Circuit:

> *Fabe*'s holding and analysis suggest that a statute may require parsing to determine the extent of its pre-emptive power under the [MFA]. At the same time, however, the Court stopped short of directing that this approach be taken in every case. *See* [*Fabe*, 508 U.S. at 509 n.8.]. *Fabe*'s holding in this respect is *simply unclear*.

*Munich Am. Reinsurance Co.*, 141 F.3d at 592 (emphasis added). In addition, the Beneficiaries point to an instance in which a court has taken the approach of evaluating the entire state statutory scheme in performing an MFA inquiry. *See Stephens v. Am. Int'l Ins. Co.*, 66 F.3d 41 (2d Cir. 1995). The United States Court of Appeals for the Second Circuit analyzed an anti-arbitration provision that was part of a state law that regulated insurance company liquidations, and that court refused to limit its focus to the anti-arbitration provision. *See id.* at 45. Instead, the court evaluated how the anti-arbitration provision related to the comprehensive regulatory scheme of the liquidation act as a whole. *See id.*

In determining whether to look at the entire act or the specific statute that conflicts with federal law, we cannot ignore the language of the MFA itself, which exempts from preemption "any law enacted by any State for the *purpose* of regulating the business of insurance." 15 U.S.C.

8

§ 1012(b) (emphasis added). Thus, determining a state's purpose in enacting a law is fundamental to a first-clause MFA inquiry. We do not read *Fabe* to alter the applicability of our well-established rules for discerning a statute's purpose, under which "[w]e determine legislative intent from the entire act and not just isolated portions." *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008) (citing *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002)). Further, "we will try to avoid construing a statutory provision in isolation from the rest of the statute; we should consider the act as a whole, and not just single phrases, clauses, or sentences." *City of Austin v. Sw. Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002) (citation omitted); *accord Calvert v. Tex. Pipe Line Co.*, 517 S.W.2d 777, 781 (Tex. 1974) ("An equally fundamental rule of statutory construction is that the intention of the Legislature must be ascertained from the entire Act, and not from isolated portions thereof.") (citing *City of Mason v. W. Tex. Utils. Co.*, 237 S.W.2d 273 (Tex. 1951)); *see also* TEX. GOV'T CODE § 311.023 (establishing principles to assist courts in construing statutes); *cf. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998) (describing a "central tenant" of statutory interpretation "that a statute is to be considered in all its parts when construing any one of them").

Accordingly, to decide whether section 74.451 is a "law enacted by [the State of Texas] for the purpose of regulating the business of insurance," 15 U.S.C. § 1012(b), we first consider how that section fits within the framework of Chapter 74 as a whole. *See 20801, Inc.*, 249 S.W.3d at 396 (stating that "when interpreting [a specific statutory section], we must consider its role in the broader statutory scheme"). This is consistent with the approach taken in *Fabe*. *See Fabe*, 508 U.S. at 494–97.

## A. Chapter 74

At the outset of the *Fabe* opinion, the Supreme Court carefully explained how the disputed statutory provision—an Ohio law that established a priority distribution hierarchy for claimants against insolvent insurance companies—fit within a broader legal structure. *Id.* at 494. The Court began by recognizing that "[t]he Ohio priority statute was enacted as *part* of a complex and specialized administrative structure for the regulation of insurance companies from inception to dissolution." *Id.* (emphasis added). Then the Court quoted the Ohio law's self-stated purpose, detailed the entire chapter's framework, and outlined some of the broad powers the chapter granted to state administrators in performing the law. *Id.* The Court concluded that "[i]t seems fair to say that the effect of all this is to empower the liquidator to continue to operate the insurance company in all ways but one—the issuance of new policies." *Id.* In other words, the Supreme Court did not analyze the specific state statutory provision that conflicted with federal law until it first considered the overall purpose, structural framework, and effect of the entire state law. We will do the same.

In evaluating the purpose and overall structure of Chapter 74, we must keep in mind the necessary focus of an MFA analysis. The MFA focuses "upon the relationship between the insurance company and its policyholders." *Id.* at 501. "Statutes aimed at protecting or regulating this relationship [between the insurer and the insured], directly or indirectly are laws regulating the 'business of insurance.'" *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 460 (1969). "The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." *Fabe*, 508 U.S. at 505 (quoting BLACK'S LAW DICTIONARY 1236, 1286 (6th ed. 1990)). A tenuous

10

connection to the ultimate aim of insurance, however, is insufficient to escape preemption. *Id.* at 509

(citing with approval *Langdeau v. United States*, 363 S.W.2d 327 (Tex. Civ. App.—Austin 1962,

no writ)).

"The relationship between insurer and insured, the type of policy which could be issued, its

reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'"

*Nat'l Sec., Inc.*, 393 U.S. at 460. *Fabe* noted that the category of laws "enacted by any State for the

purpose of regulating the business of insurance" necessarily encompasses "more than just the

'business of insurance.'" *Fabe*, 508 U.S. at 505. Nonetheless, *Fabe* stated that an analysis of what

activities constitute the "business of insurance" can be relevant to the inquiry of whether a law was

enacted for the purpose of regulating the business of insurance. *See id.* at 502–05. Courts apply

three non-dispositive criteria in evaluating whether a practice is part of the "business of insurance,"

considering whether: "(1) the practice has the effect of transferring or spreading a policyholder's

risk; (2) the practice is an integral part of the policy relationship between the insurer and the insured;

and (3) the practice is limited to entities within the insurance industry." *Munich Am. Reinsurance*

*Co.*, 141 F.3d at 590–91 (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982)).[2]

---

[2] It is unclear whether courts must apply the three "business of insurance" criteria (the *Pireno* factors) when analyzing a state law under the MFA's first clause. *See Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037, 1044 n.5 (7th Cir. 1998) ("We confess some uncertainty as to whether *Fabe* counsels us to employ the *Pireno* test in cases involving the first clause of [the MFA]."). First, *Fabe* addressed an argument favoring application of the *Pireno* factors to minimize the analysis of *National Securities*, the only other Supreme Court case to deal with the MFA's first clause. *See Fabe*, 508 U.S. at 502. The Supreme Court distinguished its previous precedent as having applied the *Pireno* factors to evaluate the phrase "business of insurance" as used in the second MFA clause relating to antitrust immunity. *Id.* at 504. Nonetheless, the Supreme Court noted that the *Pireno* factors "are relevant in determining what activities constitute the 'business of insurance,'" *id.* at 502, and the Supreme Court proceeded to address the three factors as part of its analysis of the first clause of the MFA. *Id.* at 502–05. Second, adding to the confusion, the Supreme Court later considered the applicability of the MFA in the context of the ERISA savings clause and noted that in its prior precedent "we called the [*Pireno*] factors 'relevant'; we did *not* describe them as '*required*.'" *UNUM Life Ins. Co. of Am. v. Ward*,

11

"Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the [MFA] apply." *Nat'l Sec. Inc.*, 393 U.S. at 459–60. Examples of practices that fall within the scope of the MFA include the fixing of rates, the selling and advertising of policies, and the licensing of insurance companies and their agents. *See id.* at 460. Other examples include the writing of insurance contracts and the actual performance of those contracts. *Fabe*, 508 U.S. at 503. One court has summarized that "[t]he 'business of insurance' refers to the marketing, selling, entering into, managing, servicing, and performing of insurance contracts." *Life Partners, Inc. v. Morrison*, 484 F.3d 284, 294 (4th Cir. 2007).

With the Supreme Court's guidance in mind, we evaluate the Legislature's purpose in enacting Chapter 74. We have previously explained Chapter 74's history:

> The TMLIIA was enacted in 1977 to relieve a medical "crisis having a material adverse effect on the delivery of medical and health care in Texas." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (repealed 2003). In 2003, facing another "medical malpractice insurance crisis" and a corresponding "inordinate[]" increase in the frequency of [health care liability claims] filed since 1995, the Legislature repealed the TMLIIA, amending parts of the previous article 4590i and recodifying it as Chapter 74 of the Texas Civil Practice and Remedies Code.

---

526 U.S. 358, 373 (1999) (emphasis added) (citing *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743 (1985)). Finally, cumulating the chaos, the Supreme Court ultimately rejected application of the *Pireno* factors as being beneficial to interpret the phrase "law . . . which regulates insurance" in cases involving the ERISA savings clause. *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 340–42 (2003).

   Here, the court of appeals concluded that "a thorough analysis [of the MFA's first clause] should include consideration of the *Pireno* factors." 406 S.W.3d at 324. We do not disagree, but we need not decide whether application of these factors is a mandatory component of a first-clause MFA inquiry. Instead, we address the three factors in response to the parties' arguments and the court of appeals' analysis.

*Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012) (alterations in original) (citation omitted). Regarding Chapter 74's predecessor, article 4590i, we have stated that:

> As its title suggests, the "Medical Liability and Insurance Improvement Act of Texas" was expressly intended to reduce costs of medical insurance. *See* art. 4590i, § 1.01. The reason for enactment was a "medical malpractice *insurance* crisis in the State of Texas." *Id.* § 1.02(a)(5) (emphasis added). Of the 13 legislative findings stating why Article 4590i was adopted, virtually every one is expressly related to the cost of malpractice insurance. *See id.* § 1.02(a).

*Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (per curiam). Concerning Chapter 74's structure, we have recognized that "[t]he TMLA provides a statutory framework governing health care liability claims." *CHCA Woman's Hosp., L.P. v. Lidji*, 403 S.W.3d 228, 232 (Tex. 2013). Specifically relating to insurance, we have acknowledged that:

> [Chapter 74] was enacted in 2003 as part of House Bill 4, a top-to-bottom overhaul of Texas malpractice law to "make affordable medical and health care more accessible and available to the citizens of Texas," and to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." The omnibus bill makes explicit findings describing the Legislature's concern that a spike in healthcare-liability claims had fueled an insurance crisis that was harming healthcare delivery in Texas. The Legislature specifically found that the crisis had often made insurance unavailable at any price.

*Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010) (citations omitted). "Fundamentally, the goal of the [TMLIIA] and the [TMLA] has been to make health care in Texas more available and less expensive by reducing the cost of health care liability claims." *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011). Most recently, we described that the TMLA "was aimed at broadening access to health care by lowering malpractice insurance premiums." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014).

Thus, we have made it abundantly clear that the TMLA and its predecessor were laws enacted for the purpose of making health care more affordable in Texas. As noted, the TMLA sought to achieve this goal by "reducing the cost of health care liability claims." *Scoresby*, 346 S.W.3d at 552. In other words, Chapter 74 was a law enacted for the purpose of imposing tort reform to further the goal of making health care more affordable in Texas. But this says little about how Chapter 74 regulates the "business of insurance" as the Supreme Court has explained that phrase.

The court of appeals focused entirely on how Chapter 74 impacts the relationship between malpractice insurers and health care providers, but failed to consider how Chapter 74 related to the relationship between patients and their insurance companies. *Cf. Nat'l Sec. Inc.*, 393 U.S. at 460 ("The crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies."). The Beneficiaries contend that the preamble to the TMLIIA, which was copied into the legislative findings for the TMLA but did not make it into the statutory text, establishes the Legislature's purpose of enacting "a comprehensive statutory scheme to protect the relationship between health care provider policyholders and insurers." Although ignored by both the court of appeals and the Beneficiaries, several of the legislative findings also addressed how the so-called "medical malpractice crisis" impacted health care patients:

> (8) the direct cost of medical care to the patient and public of Texas has materially increased due to the rising cost of malpractice insurance protection for physicians and hospitals in Texas;

> (9) the crisis has increased the cost of medical care both directly through fees and indirectly through additional services provided for protection against future suits or claims, and defensive medicine has resulted in increasing cost to patients, private

14

insurers, and Texas and has contributed to the general inflation that has marked health care in recent years;

(10) satisfactory insurance coverage for adequate amounts of insurance in this area is often not available at any price[.]

Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11(a)(8)–(10), 2003 Tex. Gen. Laws 884–85. Another finding summarized the effect of the law: "the adoption of certain modifications in the medical, insurance, and legal systems, *the total effect of which is currently undetermined*, will have a positive effect on the rates charged by insurers for medical professional liability insurance." *Id.* § 10.11(a)(12) (emphasis added).

These legislative findings stop short of establishing a purpose of regulating the "business of insurance" under relevant Supreme Court precedent. Although the future effect of the changes were uncertain when the Legislature enacted Chapter 74, it is possible the reform that was implemented ultimately "result[ed] in cost savings to [the insurer] which may be reflected in lower premiums if the cost savings are passed on to policyholders." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 216 (1979). But in *Royal Drug*, the Supreme Court recognized that even when insurance companies lowered rates and passed along cost savings, that was too broad for purposes of the MFA, "which exempts the 'business of insurance' and not the 'business of insurance companies.'" *Id.* at 216–17. Such *aspirations* of lower insurance rates were the entire reason Chapter 74 was enacted—to place limitations on health care liability claims so that medical malpractice insurers would lower rates for health care providers in hope that those cost savings would trickle down to patient policyholders and their insurers. This tenuous impact on the "business of insurance" is insufficient to extend MFA protection to Chapter 74. *See id*; *see also Fabe*, 508

15

U.S. at 508–09 ("*Royal Drug* rejected the notion that such indirect effects are sufficient for a state law to avoid pre-emption under the [MFA].") (citations omitted).

Although Chapter 74 as a whole has too tenuous of a connection to the "business of insurance" for purposes of the MFA, we must not forget *Fabe*'s directive that "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that . . . . necessarily encompass[] more than just the 'business of insurance.'" *Fabe*, 508 U.S. at 505 (quoting BLACK'S LAW DICTIONARY 1236, 1286 (6th ed. 1990)). This broader category includes "laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." *Id.*

The court of appeals examined Chapter 74 as a whole, relied on opinions of several other courts of appeals that have analyzed the TMLA or its predecessor, and concluded that "section 74.451 is part of a law enacted for the purpose of protecting and managing the performance of insurance policies in the area of medical malpractice and health care liability, and is therefore within the broad category of laws enacted 'for the purpose of regulating the business of insurance.'" 406 S.W.3d at 324. In reaching this conclusion, the court of appeals believed it was necessary to consider the three *Pireno* criteria. *Id.* It emphasized *Fabe*'s recognition that "performance of an insurance contract satisfies all three *Pireno* criteria because without performance there is no transfer of risk, and performance of a policy is integral to the insurer/insured relationship and is confined to entities within the insurance industry." *Id.* (citing *Fabe*, 508 U.S. at 503–04). In essence, the court of appeals focused on the relationship between medical malpractice insurers and health care

16

providers, and joined other Texas courts that have held "that section 74.451 was enacted as part of an effort to regulate the business of medical malpractice insurance in Texas." *Id.* at 326.

The court of appeals and the Beneficiaries both reach bare, unsupported conclusions that Chapter 74 is aimed at managing or enforcing the performance of insurance contracts. In *Fabe*, the Supreme Court held that the Ohio priority statute was "integrally related to the performance of insurance contracts" because it was "designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy." *Fabe*, 508 U.S. at 504. In contrast, Chapter 74 has no bearing on whether a claim is paid or coverage is denied, nor does it prescribe the terms of insurance contracts or set the rates that insurance companies can charge. *See id.* at 502–04. Chapter 74 is also silent about "the type of policy which could be issued, [or] its reliability, interpretation, and enforcement." *Nat'l Sec., Inc.*, 393 U.S. at 460. In fact, the only possible thread tying Chapter 74 to insurance contracts is the aspiration of lower premium rates, which, as noted, is not enough to qualify for the MFA's protection under *Royal Drug. See Royal Drug*, 440 U.S. at 216–17. Once the parties to an insurance contract agree upon a premium rate, Chapter 74 ceases to matter to the relationship between the insurer and the insured.

The Beneficiaries have failed to show that Chapter 74 is aimed at protecting or regulating the performance of an insurance contract in satisfaction of all three *Pireno* factors. *See Fabe*, 508 U.S. at 504–05 (concluding that performance of an insurance contract satisfies all three *Pireno* factors, and laws "'aimed at protecting or regulating' the performance of an insurance contract" fall within the MFA). The Beneficiaries offer no other support for the court of appeals' conclusion that Chapter

17

74 was enacted to regulate the business of insurance. For purposes of the MFA, we are satisfied that Chapter 74, as a whole, was not a law enacted by the Texas Legislature for the purpose of regulating the business of insurance. The court of appeals erred in concluding otherwise.

### B. Section 74.451

Because the test to determine whether laws are enacted for the purpose of regulating the business of insurance is broad, it is possible that a law, in its entirety, would fail to qualify for the MFA's exemption from preemption, but a specific statutory provision could qualify by "possess[ing] the end, intention, or aim of adjusting, managing, or controlling the business of insurance." *Fabe*, 508 U.S. at 505 (internal quotations omitted); *see, e.g., Pacheco*, 71 P.3d at 383 ("It is irrelevant that other sections of the [Colorado Health Care Availability Act], outside of sections 13–64–403(3) and (4), address medical malpractice issues not involving the relationship between an insurer and insured."). As one court of appeals has recognized, "*Fabe* teaches that the entirety of a statute need not be treated in such a way as to overlook the particularized goals of discrete statutory provisions." *Villas of Mount Pleasant, LLC v. King*, __ S.W.3d __, __, No. 06-14-00045-CV, 2014 WL 7447926, at *6 (Tex. App.—Texarkana Dec. 31, 2014, no pet.). Therefore, it is necessary to also analyze whether section 74.451 was enacted for the purpose of regulating the business of insurance.

The court of appeals considered the greater statutory scheme that section 74.451 was enacted under but failed to give meaning to *Fabe*'s holding that the parts of a state law that conflict with a federal law are exempt from preemption under the MFA only "to the extent that [the state statute] regulates policyholders." *Fabe*, 508 U.S. at 508. In other words, we interpret *Fabe* to mean that courts must also look to the specific provision of state law that conflicts with federal law to

18

determine whether the clashing parts of the state law were enacted for the purpose of regulating the business of insurance. *Id.* at 509 ("By this decision, we rule only upon the clash of priorities as pronounced by the respective provisions of the federal statute and the Ohio Code."); *see also Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 708 (5th Cir. 2002) ("The party seeking to avail itself of the [MFA] must demonstrate that application of the FAA would invalidate, impair, or supersede a *particular state law* that regulates the business of insurance.") (emphasis added). This approach aligns with the fact that the FAA does not conflict with all of Chapter 74, but only with section 74.451.[3]

At the outset, *Fabe* expressly recognized that the Ohio priority statute was enacted as *part* of an "administrative structure for the regulation of insurance companies." *Fabe*, 508 U.S. at 494. Yet merely being a *part* of an overall scheme that was enacted to regulate insurance companies was insufficient to exempt the entire priority statute from preemption, *see id.* at 508–09, and the Supreme Court expressly rejected an all-or-nothing approach that would treat the statute "as a package which stands or falls in its entirety." *Id.* at 509 n.8. Instead, the Court looked closely at the statute and parsed through it to determine which parts of the priority scheme regulated policyholders. *Id.* at 508–09.

Here, although the court of appeals recognized this essential part of *Fabe*'s holding, it distinguished *Fabe* by concluding that section 74.451 did not share the same sort of "dual goals" as

---

[3] Moreover, refusal to consider the purpose for which the conflicting, specific statutory section was enacted opens the door for manipulation. At least one other court has recognized this possibility by noting that "a state could avoid a federal preemption by simply putting the statutes into a section of the state's statutes dealing with a general unaffected subject." *Triton Lines, Inc. v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 707 F. Supp. 277, 279 (S.D. Tex. 1989).

the Ohio statute that led to the Court's careful parsing in *Fabe*. 406 S.W.3d at 325. The court of appeals held, albeit incorrectly, that section 74.451 was *part* of a law enacted for the purpose of regulating the business of insurance, and it looked no further. *Id.* at 324. In an opinion that the court of appeals relied on heavily, another court of appeals reached a different conclusion. *See Kepka*, 178 S.W.3d at 291. *Kepka* noted how the arbitration provisions in the TMLIIA related to the Legislature's overall statutory purpose and took care to point out that "the Legislature not only intended to protect patients by it, but could also have determined that the section's protections could reduce litigation over arbitration agreements' enforceability—thereby keeping down this aspect of litigation cost." *Id.* We agree with *Kepka* in this limited respect, and bearing in mind the greater statutory framework in which it was enacted, we look to whether the Legislature enacted section 74.451 for the purpose of regulating the business of insurance.

Much like the rest of Chapter 74, section 74.451 has little to do with "the relationship between the insurance company and its policyholders." *See Fabe*, 508 U.S. at 501; *see also Villas of Mount Pleasant, LLC,* __ S.W.3d at __, 2014 WL 7447926, at *7 ("[Section 74.451] has nothing to do with the relationship between insurers and insureds and is not integral to that relationship."). Relevant here, section 74.451(a) states:

> No physician, professional association of physicians, or other health care provider shall request or require a patient or prospective patient to execute an agreement to arbitrate a health care liability claim unless the form of agreement delivered to the patient contains a written notice in 10-point boldface type clearly and conspicuously stating:
>
> UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT

20

LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT FIRST CONSULTING WITH AN ATTORNEY.

TEX. CIV. PRAC. & REM. CODE § 74.451(a). Section 74.451 concerns the relationship between the patient and the health care provider. It recognizes the patient's right to assert a health care liability claim against the health care provider and requires the health care provider to give specific notice to the patient to effectuate an agreement to arbitrate a claim. *See id.* Section 74.451 is not an arbitration statute of general applicability, which courts have routinely held to fall beyond the scope of the MFA, *e.g.*, *Hart v. Orion Ins. Co.*, 453 F.2d 1358, 1360 (10th Cir. 1971), because it applies only to agreements to arbitrate health care liability claims. *See Pacheco*, 71 P.3d at 381–82 (concluding that the contested arbitration statute "is not a statute of general applicability because it targets only arbitration agreements contained in medical services contracts"). Conversely, section 74.451 is also not an arbitration statute that relates specifically to insurance contracts, which courts have found to fall under the MFA's protection. *See e.g.*, *Nat'l Home Ins. Co. v. King*, 291 F. Supp. 2d 518, 529 (E.D. Ky. 2003) (surveying cases and concluding that "both federal and state courts have held that state statutes that invalidate arbitration clauses specifically as to insurance contracts are indeed 'enacted for the purpose of regulating the business of insurance' and thus not preempted by the FAA by virtue of the [MFA]"). Section 74.451 is therefore an arbitration statute of specific applicability that applies to agreements to arbitrate health care liability claims. Section 74.451 does not, however, apply directly to insurance contracts. *See Life Partners, Inc.*, 484 F.3d at 293 (citing *Pireno*, 458 U.S. at 130) ("A contract of insurance is one by which an insured transfers risks to an insurer for the payment of a premium.").

21

The Beneficiaries nonetheless contend that "section 74.451 applies to the processing of disputed claims against policyholders, which has a direct and substantial effect on the performance of an insurance company's defense and indemnity obligations under its insurance contract with the policyholders." Once again, both the Beneficiaries and the court of appeals fail to explain how enforcement of the arbitration clause in Zapata's pre-admission agreement with Fredericksburg relates to the performance of the insurance contract between either the patient and her insurer or the health care provider and its insurer. The pre-admission agreement was not "between insurer and insured." *See Royal Drug Co.*, 440 U.S. at 216. Rather, it was a separate contractual arrangement between an insured patient and a presumably insured health care provider engaged in performing services other than insurance.[4] *See id.*; *see also St. Bernard Hosp. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 618 F.2d 1140, 1145 (5th Cir. 1980) (holding that a contract for the purchase of goods and services did not fall within the meaning of "business of insurance"). In other words, section 74.451 "may serve to protect someone who happens to be an 'insured,' but it does not protect that person in his capacity as a party to a contract of insurance." *See Autry*, 144 F.3d at 1044.

Thus, the Beneficiaries' argument stretches the scope of the MFA too far by suggesting that the inclusion of particular terms in an insurance contract can invoke the MFA's protection. The correct focus of the MFA inquiry is to identify the "*law* enacted by any State for the purpose of

---

[4] It is unknown whether Fredericksburg maintained a medical malpractice insurance policy. As its counsel conceded at oral argument, because this is an interlocutory appeal, the record has not been developed to reveal whether Fredericksburg was insured. When this dispute arose, nothing in Chapter 74 or elsewhere required nursing homes to carry malpractice insurance.

We also note this underdeveloped record to briefly address amici's concerns about the impact of our decision on Health Maintenance Organizations (HMOs). Because there is no evidence that Fredericksburg operates as an HMO, amici's concerns are not properly before the Court at this time.

22

regulating the business of insurance." 15 U.S.C. § 1012(b) (emphasis added). The only law at issue here—section 74.451—is a law that regulates the relationship between patients and health care providers, and "it is not attempting to secure the interests of those purchasing insurance policies." *Nat'l Sec.*, 393 U.S. at 460. Moreover, no component of section 74.451 seeks to ensure that "policyholders ultimately will receive payment on their claims." *Fabe*, 508 U.S. at 506. The Beneficiaries have failed to show that section 74.451 is aimed at protecting or regulating the performance of a contract of insurance—either between the health care provider and its malpractice insurer, or the patient and its insurer—to satisfy all three *Pireno* factors. *See id.* at 504–05 (concluding that performance of an insurance contract satisfies all three *Pireno* factors, and laws "'aimed at protecting or regulating' the performance of an insurance contract" fall within the MFA). Section 74.451 is not a law enacted for the purpose of regulating the business of insurance for purposes of the MFA.

## IV. Conclusion

Section 74.451 of the Texas Civil Practice and Remedies Code was not a law enacted by the Texas Legislature for the purpose of regulating the business of insurance. It simply applies to agreements to arbitrate health care liability claims between patients and health care providers. Accordingly, the MFA does not exempt section 74.451 from preemption by the FAA, and the trial court should have granted Fredericksburg's motion to compel arbitration. We reverse the court of appeals' judgment and remand this case to the trial court to proceed in a manner consistent with this opinion.

23

_____
Paul W. Green
Justice

OPINION DELIVERED: March 6, 2015

# TAB 2

FILE COPY

RE: Case No. 13-0576                    DATE: 6/26/2015
      COA #: 04-13-00110-CV      TC#: 2012-CI-16420
STYLE: THE WILLIAMSBURG CARE COMPANY, L.P.
    v. JESUSA ACOSTA, ET AL.

      Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced cause.

                    HONORABLE RICHARD EDWARD PRICE
                    408TH DISTRICT COURT
                    BEXAR COUNTY COURTHOUSE 2ND FL
                    100 DELOROSA
                    SAN ANTONIO, TX  78205

FILE COPY

RE: Case No. 13-0577               DATE: 6/26/2015
    COA #: 04-13-00112-CV    TC#: 2012-CI-20420
STYLE: THE FREDERICKSBURG CARE COMPANY, L.P.
   v. BRENDA LIRA, AS REPRESENTATIVE OF THE ESTATE OF
      GUADALUPE QUESADA, DECEASED

    Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced cause.


                    MS. DONNA KAY MCKINNEY
                    BEXAR COUNTY DISTRICT CLERK
                    PAUL ELIZONDO TOWER
                    101 W. NUEVA, SUITE 217
                    SAN ANTONIO, TX  78205-3411

FILE COPY

RE: Case No. 13-0573                    DATE: 6/26/2015
COA #: 04-13-00111-CV      TC#: 2012-CI-20420
STYLE: THE FREDERICKSBURG CARE COMPANY, L.P.
   v. JUANITA PEREZ, VIRGINIA GARCIA, PAUL ZAPATA, AND
      SYLVIA SANCHEZ, INDIVIDUALLY AND AS ALL HEIRS OF
      ELISA ZAPATA, DECEASED

   Today the Supreme Court of Texas denied the motion
for rehearing in the above-referenced cause.

                    HONORABLE RICHARD EDWARD PRICE
                    408TH DISTRICT COURT
                    BEXAR COUNTY COURTHOUSE 2ND FL
                    100 DELOROSA
                    SAN ANTONIO, TX  78205

# TAB 3

# IN THE SUPREME COURT OF TEXAS

## NO. 13-0576

THE WILLIAMSBURG CARE COMPANY, L.P., PETITIONER

V.

JESUSA ACOSTA, ET AL., RESPONDENTS

## MANDATE

**To the Trial Court of Bexar County, Greetings:**

Before our Supreme Court on March 6, 2015, the Cause, upon petition for review, to revise or reverse your Judgment.

No. **13-0576** in the Supreme Court of Texas

No. **04-13-00110-CV** in the **Fourth** Court of Appeals

No. **2012-CI-16420** in the **73rd District Court** of **Bexar** County, Texas, was

determined; and therein our said Supreme Court entered its judgment or order in these words:

THE SUPREME COURT OF TEXAS, having heard this cause on petition for review from the Court of Appeals for the Fourth District, and having considered the appellate record and counsels' briefs, but without hearing oral argument pursuant to Texas Rule of Appellate Procedure 59.1, concludes that the court of appeals' judgment should be reversed.

IT IS THEREFORE ORDERED, in accordance with the Court's opinion, that:

1) The court of appeals' judgment is reversed;

2) This case is remanded to the trial court to proceed in a manner consistent with the Court's opinion;

3) The Williamsburg Care Company, L.P. shall recover, and Jesusa Acosta, et al., shall pay, the costs incurred in this Court and in the court of appeals.

Copies of this judgment and the Court's opinion are certified to the Court of Appeals for the Fourth District and to the 73rd District Court of Bexar County, Texas, for observance.

**Wherefore we command you** to observe the order of our said Supreme Court in this behalf, and in all things to have recognized, obeyed, and executed.

BY ORDER OF THE SUPREME COURT OF THE STATE OF TEXAS,

with the seal thereof annexed, at the City of Austin, this the 26th day of June, 2015.

Blake A. Hawthorne, Clerk

By Monica Zamarripa, Deputy Clerk

# IN THE SUPREME COURT OF TEXAS

## NO. 13-0577

### THE FREDERICKSBURG CARE COMPANY, L.P., PETITIONER

V.

### BRENDA LIRA, AS REPRESENTATIVE OF THE ESTATE OF GUADALUPE QUESADA, DECEASED, RESPONDENTS

## MANDATE

**To the Trial Court of Bexar County, Greetings:**

Before our Supreme Court on March 6, 2015, the Cause, upon petition for review, to revise or reverse your Judgment.

No. **13-0577** in the Supreme Court of Texas

No. **04-13-00112-CV** in the **Fourth** Court of Appeals

No. **2012-CI-20420** in the **407th District Court** of **Bexar** County, Texas, was determined; and therein our said Supreme Court entered its judgment or order in these words:

THE SUPREME COURT OF TEXAS, having heard this cause on petition for review from the Court of Appeals for the Fourth District, and having considered the appellate record and counsels' briefs, but without hearing oral argument pursuant to Texas Rule of Appellate Procedure 59.1, concludes that the court of appeals' judgment should be reversed.

IT IS THEREFORE ORDERED, in accordance with the Court's opinion, that:

1)   The court of appeals' judgment is reversed;

2)   This case is remanded to the trial court to proceed in a manner consistent with the Court's opinion;

3)    The Fredericksburg Care Company, L.P. shall recover, and Brenda Lira, as representative of the estate of Guadalupe Quesada, deceased, shall pay, the costs incurred in this Court and in the court of appeals.

Copies of this judgment and the Court's opinion are certified to the Court of Appeals for the Fourth District and to the 407th District Court of Bexar County, Texas, for observance.

**Wherefore we command you** to observe the order of our said Supreme Court in this behalf, and in all things to have recognized, obeyed, and executed.

BY ORDER OF THE SUPREME COURT OF THE STATE OF TEXAS,

with the seal thereof annexed, at the City of Austin, this the 26th day of June, 2015.

Blake A. Hawthorne, Clerk

By Monica Zamarripa, Deputy Clerk

# IN THE SUPREME COURT OF TEXAS

## NO. 13-0573

THE FREDERICKSBURG CARE COMPANY, L.P., PETITIONER

V.

JUANITA PEREZ, VIRGINIA GARCIA, PAUL ZAPATA, AND SYLVIA
SANCHEZ, INDIVIDUALLY AND AS ALL HEIRS OF ELISA ZAPATA,
DECEASED, RESPONDENTS

## MANDATE

**To the Trial Court of Bexar County, Greetings:**

Before our Supreme Court on March 6, 2015, the Cause, upon petition for review, to revise or reverse your Judgment.

No. **13-0573** in the Supreme Court of Texas

No. **04-13-00111-CV** in the **Fourth** Court of Appeals

No. **2012-CI-20420** in the **407th District Court** of **Bexar** County, Texas, was determined; and therein our said Supreme Court entered its judgment or order in these words:

THE SUPREME COURT OF TEXAS, having heard this cause on petition for review from the Court of Appeals for the Fourth District, and having considered the appellate record, briefs, and counsel's argument, concludes that the court of appeals' judgment should be reversed.

IT IS THEREFORE ORDERED, in accordance with the Court's opinion, that:

1) The court of appeals' judgment is reversed;

2) This case is remanded to the trial court to proceed in a manner consistent with the Court's opinion;

3) The Fredericksburg Care Company, L.P. shall recover, and Juanita Perez, Virginia Garcia, Paul Zapata, and Sylvia Sanchez, individually and as all heirs of Elisa Zapata, deceased, shall pay, the costs incurred in this Court and in the court of appeals.

Copies of this judgment and the Court's opinion are certified to the Court of Appeals for the Fourth District and to the 407th District Court of Bexar County, Texas, for observance.

**Wherefore we command you** to observe the order of our said Supreme Court in this behalf, and in all things to have recognized, obeyed, and executed.

BY ORDER OF THE SUPREME COURT OF THE STATE OF TEXAS,

with the seal thereof annexed, at the City of Austin, this the 26th day of June, 2015.

Blake A. Hawthorne, Clerk

By Monica Zamarripa, Deputy Clerk